# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MICHELLE LINGENFELTER,

        Plaintiff,

v.                                                           No. CIV 01-197 MCA/LFG

LARRY G. MASSANARI, ACTING
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

Plaintiff Michelle Lingenfelter ("Lingenfelter") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Lingenfelter was not eligible for supplemental security income ("SSI"). Lingenfelter moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. 9.]

Lingenfelter was born on March 11, 1973 and was 26 years old when the administrative hearing was held. She has a high school diploma and completed three years of college. She previously worked as a cashier, courtesy clerk and hostess in a grocery store, child care worker, shoe store clerk, and customer service employee at a drugstore. She states that she became disabled on

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

about October 12, 1996, after colliding with a child that resulted in an injury to Lingenfelter's right knee.[2] Lingenfelter alleges that she has not been able to work since that date due to musculoskeletal and mental problems.

Lingenfelter applied for SSI on October 19, 1998. Her application was denied at the initial and reconsideration stages, and she sought timely review from an Administrative Law Judge ("ALJ"). An administrative hearing was held on November 15, 1999. In a decision, dated December 20, 1999, the ALJ found that Lingenfelter was not disabled within the meaning of the Social Security Act ("the Act") and denied the benefit request. Lingenfelter challenged this determination to the Appeals Council which denied her request for review on January 16, 2001. This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that

---

[2] Dates of this injury vary. The Medical Evaluation Center's report, dated May 20, 1999 and supplied by Lingenfelter's attorney to the ALJ, provides a date of November 30, 1995 for this injury. (Tr. at 295.) Other documents in the record show a date of October 12, 1996.

[3] 20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4] 20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5] 20 C.F.R. § 404.1520(b) (1999).

2

it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[8] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[9] age, education and past work experience, she is capable of performing other work.[10] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[11]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy. Id. at 669-670. Before applying the grids, the ALJ must first find the following: "(1) that the claimant has no significant non-

---

[6] 20 C.F.R. § 404.1520(c) (1999).

[7] 20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[8] 20 C.F.R. § 404.1520(e) (1999).

[9] One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[10] 20 C.F.R. § 404.1520(f) (1999).

[11] Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

3

exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category." Id. at 669 (*relying on* Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)). Non-exertional limitations can include mental impairments. The grids do not consider non-exertional limitations; therefore, if significant non-exertional limitations are present, the grids may not be applicable. Id. However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work." Id. (internal citations omitted.) In this case, the ALJ utilized a vocational expert at the hearing and used the grids as guidance in reaching his determination of non-disability at step five of his analysis.

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After carefully reviewing Lingenfelter's medical and mental health records, symptoms and complaints (Tr. at 16), the ALJ rejected Lingenfelter's claim for SSI at step five, concluding that there were light level other jobs in the regional and national economy that Lingenfelter could perform. (Tr. at 22.) In reaching this decision, Judge Paul Keohane considered the testimony of the Vocational Expert ("VE") and first made the following findings: (1) Lingenfelter had not engaged in substantial gainful activity after her alleged onset date; (2) Lingenfelter had a "severe" impairment or combination of impairments that included hip pain, cartilage tear in right knee, damaged nerve in left shoulder and ulnar nerve of elbows, depression and sleep problems; (3) Lingenfelter's impairments did not meet or equal any of the Listings; and (4) Lingenfelter was unable to return to her past relevant work. The burden then shifted to the Commissioner at step five to show that Lingenfelter's age, education, work experience and RFC would permit her to successfully adapt to a significant number of jobs available in the regional and national economy and that there were jobs existing in significant numbers in the regional and national economy that Lingenfelter could perform. In deciding that Lingenfelter could perform certain other kinds of work and that such work was available, Judge

5

Keohane acknowledged that he also had to consider non-exertional impairments, such as Lingenfelter's alleged pain complaints and mental limitations, and explained why these alleged impairments did not alter his decision. (Tr. at 22.)

In this appeal, Lingenfelter asserts that the case must be reversed and remanded because the ALJ's decision is internally inconsistent, the ALJ erred in his RFC finding and the ALJ erred in his application of the grids. [Doc. 10, 12.] The Commissioner claims the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations. [Doc. 11.]

After a review of the entire record, this Court agrees that there was substantial evidence to support the ALJ's findings that Lingenfelter's overall condition did not preclude her from performing light work activities and/or that she retained a RFC for light work activity. The Court disagrees that the ALJ judge committed any error in his RFC finding or in applying the grids. Therefore, the Court recommends that Lingenfelter's motion to reverse be denied.

## Summary of Lingenfelter's Medical Care/Conditions

Lingenfelter has a history of abnormal fragility of bones, known as *osteogenesis imperfecta*. The condition can result in multiple fractures and/or shortening of the extremities. Lingenfelter's condition of *osteogenesis imperfecta* does not appear to be related to the impairments of which she complains in her application for SSI, i.e., prior injuries to her right elbow, left shoulder, and right knee, and depression. (Tr. at 182, 254, 295.) In July 1993, Lingenfelter fell against a partition behind a cash register and hit her left shoulder, resulting in an injury. In October 1994, she injured her right elbow while lifting and scanning cans at a grocery store. In late 1995 or late 1996, she fell down after a collision with a child and suffered injuries to her right knee.

In October 1994, Lingenfelter began to see Dr. Thomas Grace (orthopaedic surgeon) for her shoulder; she also complained about her elbow. She was prescribed physical therapy by Dr. Grace and placed on light duty for a short time in late 1994. In January 1995, Dr. Grace noted that Lingenfelter did not want to return to work. He asked Dr. Richard Ball to see her because he was unsure whether he should push her. (Tr. at 144.) Dr. Ball saw Lingenfelter for complaints about her elbow on a number of occasions from 1995 through part of 1999. Dr. Ball attempted to treat her complaints conservatively. (Tr. at 283.) At one point on May 30, 1995, he considered surgery but looked at that option "still with some caution." (Tr. at 286.)

Many of the tests performed on Lingenfelter, related to her complaints about her knee, shoulder and elbow, revealed normal results. (*See, e.g.* Tr. at 286, 302, 303.) Dr. Seelinger, with Neurology Consultants, conducted a nerve conduction electro-diagnostic test and with normal results and "no weakness." (Tr. at 158.) Regarding the injury to her right knee, it was examined at UNM and the medical notes show no fracture, normal gait, and a slight bruise. (Tr. at 296.) Dr. Field Blevins (UNM Department of Orthopaedics) took x-rays of the knee in December 1995 that were normal. In January 1996, however, a MRI showed a complex meniscal tear in her knee although Dr. Blevins believed that the results showed a reasonable chance of healing. (Tr. at 208, 206.) Moreover, Dr. Blevins did not feel the "meniscus tear was causing the majority of symptoms." (Tr. at 223.) Lingenfelter received physical therapy for an extended period of time. (Tr. at 296.) On one occasion in April 1996, the therapist commented that Lingenfelter had a negative attitude and was unmotivated. (Tr. at 216.)

In June 1996, Dr. Ball's medical records show that Lingenfelter's EMG's were normal. During that same month, more testing was conducted by Dr. Seelinger that showed "no weakness."

7

The results were "normal." (Tr. at 151.) In July 1996, Lingenfelter had surgery (medial epicondylectomy) on her right elbow. (Tr. at 166, 224.) She did have a significant constriction of the ulnar nerve at that area, and the doctors removed the medial epicondyle, releasing the muscle mass. (Tr. at 225.)

In September 1996, Dr. Blevins "definitely questioned" whether the small tear in the meniscus in the knee could cause all of the symptoms of which she complained. (Tr. at 214.) In October and November 1996, the occupational therapist commented that Lingenfelter's home exercise involvement was questionable and that her pain behaviors were inconsistent with 3 month post-epicondylectomy. (Tr. at 163, 164.)

In December 1996, Dr. Blevins examined her right knee and noted that "it does not keep her from doing anything." (Tr. at 213.) He further commented that her MRI results do not correlate with her clinical symptoms. (Tr. at 213.)

Lingenfelter continued to complain of pain associated with her right elbow, left shoulder and right knee. The doctors recommended arthroscopy on her knee but she then discovered that she was pregnant and had to delay surgery. (Tr. at 205.) In May 1997, a Functional Capacity Assessment was conducted, that refers to a "mild limitation of the right elbow." (Tr. at 169, 173.) The physical therapist noted that she did not put forth maximal effort in testing and she magnified her symptoms. (Tr. at 173.) The therapist also commented that she had no motivation to return to work and appeared to be engaging in attention getting behavior. (Tr. at 174.)

In January 1998, Dr. Ball examined her right elbow and noted a "little exaggerated pain response" and that he believed he was dealing with a "minor pain syndrome." (Tr. at 282.) He

refused to fill out a total disability form that Lingenfelter requested he sign. (Id.) Dr. Seelinger again conducted tests and found no weakness, etc. (Tr. at 226.)

Her complaints of depression appear to be documented for the first time in 1998 medical records. (Tr. at 183, 196.) She was prescribed Zoloft and Sarah Brennan PhD, the psychologist, commented that her depression was lessening and later that Zoloft had quickly alleviated most of the depressive symptoms. (Tr. at 186.) However, Dr. Brennan also noted that Lingenfelter had "major depressive disorder" and a GAF of 55. (Tr. at 184.)

In early 1999, she saw a different psychologist who found that she had depression and anxiety. (Tr. at 304.) In January 1999, a psychological evaluation was conducted and the results showed that she was minimally limited. (Tr. at 238.) On February 10, 1999, an Industrial Rehabilitation Exam was conducted. (Tr. at 249.) The report noted that she was independent in driving, feeding herself, grooming her self, walking without a cane and that she could lift up to 10 pounds. The physician, conducting the study, noted that she could work eight hours a day in light to sedentary jobs.

In early 1999, she was diagnosed with PTSD related to early childhood sexual trauma and depression. (Tr. at 308.) However, after reviewing all of the medical records (post 1995), it does not appear that any of the psychologists, therapists or physicians recommended that Lingenfelter not return to work, nor did they document that she was disabled.

## Discussion

### The ALJ Did Not Err in His Step Five Analysis

The focus of this appeal is that the ALJ erred at step five in finding a RFC for light work, in view of Lingenfelter's alleged depression and limitations in psychological resources. Specifically, Lingenfelter argues that the ALJ's inconsistent references to Lingenfelter's depression as being both

9

severe and non-severe warrant a remand for additional fact finding. Lingenfelter also contends that the ALJ did not consider some of the mental health records and scores that demonstrated her mental limitations and should have precluded the RFC finding that the ALJ made. Finally, Lingenfelter claims that the grids were applied contrary to the evidence and law, again because the ALJ allegedly did not consider alleged psychological limitations mentioned by various health care providers.

### A. *Alleged Inconsistent References to Depression in ALJ's Decision:*

Plaintiff's counsel argues that the ALJ's finding at step two including that "Lingenfelter's depression was a severe impairment . . . ." is inconsistent with the later finding that "her alleged problems with depression and concentration are non-severe and present no more than moderate limitation in any area of mental or social functioning" [Doc. 10 at 3.] Lingenfelter posits that this internal inconsistency in the ALJ's decision justifies a remand for additional fact finding.

The Court does not find this language to be conclusively inconsistent or to warrant additional fact finding. At step two, the exact findings were as follows:

> The claimant has had a 'severe' impairment or combination of impairments: hip pain, cartilage tear in right knee, damaged nerve in left shoulder and ulnar nerve of elbows, depression and sleep problems.[12]

(Tr. at 15.) This finding does not state that Lingenfelter's depression, standing alone, was a severe impairment. The language could be read to mean that Lingenfelter had a combination of impairments sufficient to satisfy her burden at step two. The ALJ concluded that Lingenfelter had met her burden as to steps one through four and proceeded to step five. He then acknowledged that before applying

---

[12]The applicable CFR section provides that "we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. 20 C.F.R. § 404.1523.

the grids, he had to determine whether her problems with depression and concentration were non-severe and/or whether they interfered with her ability to work. *See* Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997) (setting forth the analysis). After deciding that her mental limitations presented no more than "moderate limitation" in areas of mental or social functioning, the ALJ properly proceeded to apply the grids.

Although Plaintiff's counsel cites Taylor for the proposition that inconsistencies in an ALJ's decision may warrant remand, Taylor was remanded for a number of reasons, none of which appeared to include "inconsistencies" in the opinion. For example, in Taylor, even the Commissioner requested reversal and remand. Id. at 668. The court also concluded that the ALJ ignored the plaintiff's complaints of nonexertional impairments and cited no record evidence for such findings. Id. at 669. The district court held that the record did not contain "substantial evidence" to support the ALJ's finding of no significant exertional impairments and that therefore, reliance on the grids was improper. Id.

Contrary to the result in Taylor, the ALJ in this case did not ignore Lingenfelter's complaints of nonexertional impairments and did cite record evidence for his findings. Moreover, the Court finds no "internal inconsistency" as alleged by Plaintiff.

### B. ALJ's Consideration of Mental Health Records and RFC Finding:

Plaintiff appears to argue that the ALJ did not believe Lingenfelter was depressed and that she should have been believed since "Lingenfelter's treating physicians believe[d] her complaints of depression" (confirmed by prescriptions for antidepressants). [Doc.10 at 3.] Plaintiff also contends that the ALJ improperly failed to consider Lingenfelter's Global Assessment of Functioning ("GAF") score of 51 "which is at the very bottom of the moderate level of difficulty in social, occupational,

11

or school functioning." Generally, Plaintiff's attorney claims that Lingenfelter's mental limitations, including a diagnosis of PTSD, depression and anxiety, along with scores consistent with "rumination, suspiciousness, unusual experiences and social isolation" were ignored by the ALJ. If the ALJ had considered the medical records demonstrating these diagnoses and conditions, Plaintiff believes that the ALJ would not have made the RFC finding that Lingenfelter could perform light work activity. (Tr. at 21.)

Judge Keohane's decision acknowledged Lingenfelter's complaints of depression, as well as her reports that she had decreased concentration, early insomnia, restlessness and nightmares. (Tr. at 19.) He documented that she had been on anti-depressant medication, had undergone therapy, and that her treating physician diagnosed her with depression. The ALJ also stated that [her most recent] GAF was 68, "denoting mild symptoms of depression." (Tr. at 19.)

The ALJ's thorough decision confirms that the judge examined many medical records in reaching his conclusion. Although quantity is not determinative, it appears that the ALJ read dozens of Lingenfelter's medical records and examined medical test results as well. (*See* Tr. at 15-20.) There is no indication that Judge Keohane ignored Lingenfelter's mental condition; he merely concluded that her mental impairment was non-severe, a finding that the record supports. (Tr. at 22.)

There was no uncontroverted evidence that the ALJ chose not to rely upon, nor any significantly probative evidence he rejected. Plaintiff emphasizes that the ALJ ignored Lingenfelter's GAF score of 51. In June 1998, Dr. Brennan assigned Plaintiff a GAF score of 55, although Dr. Brennan also noted that the Zoloft medication had alleviated most of Lingenfelter's depressive symptoms. (Tr. at 184, 186.) In March 1999, Dr. Diane Castillo assigned Lingenfelter a GAF score of 51. (Tr. 271, 314.) In April 1999, Lingenfelter was assigned a GAF score of 68. Clearly, the GAF

score of 51 is not "uncontroverted" evidence that the ALJ ignored. Where there is a conflict in the evidence, the ALJ, as the trier of fact, may resolve the conflict. Casias v. Secretary of Health & Human Services, 933 F.2d 799, 801 (10th Cir. 1991). Here, it appears that the ALJ emphasized the most recent GAF score in the medical records. Moreover, while the GAF score "may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." Howard v. Commissioner of Social Security, 276 F.3d 235, 2002 WL 27315 at * 4 (6th Cir. 2002). *See also* Purvis v. Commissioner of the Social Security Administration, 57 F. Supp. 2d 1088, 1093 (D. Oreg. 1999) (9th Circuit authority would not require a finding of disability based on a GAF score of 50, by itself; rather, disability determinations should be made on a case by case basis, after considering all the evidence, including GAF scores.)

With respect to Lingenfelter's RFC, the ALJ concluded that her "overall condition [did] not preclude her from performing light work activities." (Tr. at 20.) In reaching this decision, Judge Keohane considered Lingenfelter's many repeat nerve tests that showed normal results. He also considered the Residual Functioning Capacity Assessment, dated March 2, 1999, that indicated she as capable of performing light work with some occasional limitations. (Tr. at 19.) The ALJ acknowledged that Dr. Reeves, who examined Lingenfelter on February 10, 1999, with respect to her disability application, concluded that she could work eight hours a day in light to sedentary jobs. (Tr. at 20.) A Residual Functional Capacity Assessment, dated March 2, 1999, found that Lingenfelter could perform light work activity. Lingenfelter herself testified or provided statements that she took care of her own personal hygiene, drove her husband to work, got along with some relatives, visited with a few friends, watched TV all day, did some housework and cared for her 22 pound baby. The ALJ considered these types of activities to be consistent with the ability to perform

light work activities. (Tr. at 21.) Finally, the ALJ noted that her pain complaints were not fully credible as is well documented by several physicians and therapists who treated Lingenfelter.

The ALJ's finding that Lingenfelter could perform light work activities is supported by substantial evidence. His opinion adequately evaluates all of the relevant evidence, and he has explained the basis for his conclusions. He evaluated Lingenfelter's credibility and found it lacking, to some degree, for the reasons he set forth in his decision. The Court defers to the ALJ with respect to his ability to observe and assess witness credibility. Casias, 933 F.2d at 801. Moreover, none of Lingenfelter's treating physicians or mental health specialists indicated that Lingenfelter was unfit to perform light work activities. (*Compare* Medical Evaluation, dated May 20, 1999, and supplied by Plaintiff's counsel, recommending sedentary work only; Tr. at 301.) There is no "overwhelming" medical or psychological evidence to support reversal or remand.

### C. The ALJ's Application of the Grids:

Lingenfelter's attorney argues that the grids were not applied properly in this case because the ALJ did not include the limitations in psychological resources mentioned by Dr. Brennan and Dr. Castillo. [Doc. 10 at 7-8.] To the contrary, the ALJ expressly stated in his decision that the grids or vocational rules could not be applied directly when there were non-exertional impairments, including Lingenfelter's "alleged pain complaints and mental limitations." (Tr. at 22.) The ALJ then determined, however, that her problems with depression and concentration were non-severe and did not present more than a moderate limitation in any area of mental or social functioning. Therefore, the grids could be applied and used as a "framework and guide for decision-making." (Tr. at 22.)

There was substantial evidence to support a finding that Lingenfelter's mental impairment was non-severe. Lingenfelter's first visit to a psychologist appeared to coincide with her application for

14

social security benefits. (*See* Tr. at 4, noting application for SSI benefits, dated 3/25/98.) Plaintiff did not appear to have received mental health care or treatment prior to applying for disability. The first medical records including complaints regarding mental health issues were dated March 27, 1998. (Tr. at 196.) None of the psychologists or physicians indicated that she was unfit to work due to mental limitations. The anti-depressants that she started taking in 1998 appeared to resolve most of her depressive symptoms rather quickly, according to Dr. Brennan. Many of Lingenfelter's own statements confirmed that she was able to function adequately in social and work settings, even though she contradicted herself at times.

"Use of the [grids] is appropriate when it is established that a claimant suffers only from exertional impairments, or [when] the claimant's nonexertional impairments do not significantly affect [her] residual functional capacity." Loza v. Apfel, 219 F.3d 378, 398 (5th Cir. 2000). Moreover, the "mere presence of a nonexertional impairment does not automatically preclude reliance on the grids." Channel v. Heckler, 747 F.2d 577, 583 n. 6 (10th Cir. 1984). Finally, this is not a case where the ALJ made a finding of nondisability "conclusively on the grids." Judge Keohane states that he used the grids as a framework or guide in reaching his decision. He also sought testimony from a vocational expert to demonstrate that Lingenfelter could perform other jobs that were available in the national and regional economies.

The Court concludes that the ALJ's findings were supported by substantial evidence and that no error was committed in applying the grids.

**Recommended Disposition**

That Plaintiff's Motion to Reverse and Remand for a Rehearing be denied and that the matter be dismissed with prejudice.

_____
Lorenzo F. Garcia
United States Magistrate Judge